UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| J.M.S. by her father ) <br> JEREMY W. SPENCER, ) <br> ) <br>     Plaintiff, ) <br> ) <br>   vs. ) <br> ) <br> MICHAEL J. ASTRUE, Commissioner of ) <br> Social Security, ) <br> ) <br>     Defendant. ) | Cause No. 1:11-cv-00243-WTL-TAB |

### ENTRY ON JUDICIAL REVIEW

Plaintiff's father, Jeremy Spencer ("Plaintiff"), requests judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Titles XVI of the Social Security Act ("the Act"). The Court rules as follows.

### I. SUBSTANTIVE BACKGROUND

#### A. J.M.S.'s History

J.M.S. was born December 6, 1997. J.M.S.'s mother used marijuana during her pregnancy. Due to her mother's continued drug use, J.M.S. was removed from her mother's home around the age of eight and temporarily placed in a foster home. J.M.S. alleges that during her time in foster care, her foster parent's grandson unsuccessfully attempted to have sexual contact with her. She also reports that, while in foster care, she was hit with rulers and extension cords for making mistakes. J.M.S. currently resides with her father.

J.M.S. receives ongoing counseling for issues including, but not limited to, depression,

post-traumatic stress disorder, and anxiety. She reports having trouble sleeping and coping with her mother's absence. J.M.S. gets angry with her siblings and has frequent feelings of sadness. Medical treatment notes from 2007 and 2009 indicate J.M.S. has a global assessment functioning ("GAF") score ranging in the low fifties to mid-sixties.

## B.  J.M.S.'s Medical History

In October 2006, Gallahue Mental Health Services reported that J.M.S. had daily worries about her mother and whether she would have to return to foster care. In November 2006, a Gallahue psychiatric evaluation reported that J.M.S. did not like to go to sleep and her conduct was aggressive. She was diagnosed at that time with adjustment disorder with mixed disturbance of emotion and conduct.

In July 2007, Gallahue noted that J.M.S. had feelings of anger and sadness. She reported that some days were better, but that those days did not last long. J.M.S. described fighting within the family and the feeling that she had an "anger volcano." R. at 207.

In August 2007, J.M.S. was diagnosed by Dr. Carrie Dixon, a state agency physician, with major depression (mild), post-traumatic stress disorder, parent/child relational problems, and disruptive behavior disorder. During the evaluation, J.M.S. indicated that she had made A's and B's in school. J.M.S. reported that she had five best friends and that she got along okay with some neighbors and classmates. She stated that her chores were to clean the bathroom, make her bed, and clean her room. J.M.S. also reported that she could cook simple things.

In October 2007, J.M.S.'s teacher reported that J.M.S. was doing well, was an honor roll student, and that she was a pleasure to have in class. Her teacher indicated that J.M.S. had friends and did not get into arguments with others. J.M.S.'s teacher also stated that she had not

2

exhibited outbursts or anger in class.

Dr. F. Kladder and Dr. Steven Roush, state agency psychologists, evaluated J.M.S. in October 2007. They found that J.M.S.'s impairments were severe, but were not enough to meet, medically equal, or functionally equal the listings. They found no limitations in any of the six domains.

In December 2007, J.M.S. reported hearing people call her names and seeing a vision of a shadow of a lady with a white, long cover. She again reported fighting with her sister and that she did not like to go to sleep. However, at the same time, Dr. Randal Horton, a state agency psychologist, found that J.M.S.'s impairments were severe, but were not enough to meet, medically equal, or functionally equal the listings. He found a less than marked limitation in one domain: interacting and relating to others. Dr. Joseph Gaddy made the same findings in January 2008.

In January 2009, Gallahue noted that J.M.S. talked about hanging herself and exhibited signs of depression. J.M.S. had bags under her eyes and Gallahue reported that she did not sleep like she should. Gallahue observed that J.M.S. had mood swings, bullied her siblings, and exhibited random hyperactivity.

Treatment notes in February 2009 indicate that J.M.S. had a high level of functioning. J.M.S. reported she was accepted into a magnet school. In March 2009, J.M.S. reported that she was involved in numerous extracurricular activities. She reported that her life was "busy but going very well." R. at 301. Her assessment notes stated that J.M.S. has a high level of functioning.

In July 2009, a treatment report stated that J.M.S's depression had decreased and that she

exhibited moderate progress towards elevating her mood. J.M.S.'s continued mood swings, problems sleeping, and depression were recorded by Gallahue in August 2009.

In September 2009, J.M.S.'s medical evaluation indicated that she had delusions. J.M.S. stated she was scared of sunflowers because she thought that they were breathing. J.M.S. also reported that she saw a vision of a woman in a blue dress that spoke to her. Gallahue reported that J.M.S. had attempted to hang herself in the shower on Valentine's Day and that she still had suicidal thoughts. J.M.S. indicated that she thought about hurting her siblings but had never acted upon this. Gallahue reported that she had cut herself by stabbing sharp objects into her arm. She was described as being angry, depressed, and anxious. J.M.S. was prescribed Zoloft and Seroquel.

### C. Testimony

During the hearing, J.M.S. testified that she was in sixth grade and enrolled in regular classes. She stated she received A's and B's in school, with the exception of an F in math. Spencer's attorney stated that J.M.S. had career aspirations of becoming a physician.

Spencer's attorney stated, and Spencer agreed, that J.M.S. had attempted to commit suicide by hanging herself in the shower after arguing with her sister. However, according to Spencer's attorney, J.M.S.'s mental health provider did not feel that she was in any danger of hurting herself. He also reported that she had never been hospitalized for any mental health issues.

J.M.S. testified that she saw a vision of a woman in a blue and white dress on her school bus in fifth grade. She stated that the woman spoke to her. J.M.S. reported that since taking medication, she no longer had visions of the woman.

## II.  PROCEDURAL BACKGROUND

Spencer initially filed his application for SSI on June 28, 2007, alleging that his minor child, J.M.S., born December 6, 1997, became disabled in 2005 due to depression.  His application was denied initially and upon reconsideration, whereupon he requested and was granted a hearing before an Administrative Law Judge ("ALJ").  A hearing was held before ALJ Zane Gill on October 21, 2009, at which Spencer was represented by counsel.  Spencer and J.M.S. testified at the hearing.  The ALJ issued a decision denying Spencer's application on April 26, 2010.  On January 10, 2011, the Appeals Council affirmed the ALJ's decision.  Spencer then filed this timely appeal.

## III.  APPLICABLE STANDARD

To be eligible for SSI, a claimant must have a disability under 42 U.S.C. § 423.  "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  The standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *See Stephens v. Heckler,* 766 F.2d 284, 285 (7th Cir. 1985).

In determining whether a claimant under the age of 18 is disabled, the Commissioner employs a three-step sequential analysis.  20 C.F.R. § 416.924(a).  At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition.  20 C.F.R. § 416.924(b).  At step two, if the claimant does not have a "severe," impairment or a combination of impairments that is "severe" she is not disabled.  20 C.F.R. § 416.924(c).  If the impairment is severe, the analysis proceeds under step three, under which the Commissioner

determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments or that functionality equals the listings. 20 C.F.R. pt. 404, subpt. P, App. 1. If the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the listings and meets the twelve-month duration requirement, the claimant is deemed disabled. 20 C.F.R. § 416.906.

In determining whether an impairment functionally equals the listings, the ALJ must examine six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). The claimant's impairment or combination of impairments must result in "marked" limitations in two or more domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926(a). A "marked" limitation is one that seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that very seriously interferes with the claimant's ability to sustain and complete activities. 20 C.F.R. § 416.924a(e)(3)(i).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate

in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV.  THE ALJ'S DECISION

Applying the three-step analysis, the ALJ found at step one that J.M.S. had not engaged in substantial gainful activity at any time relevant to the decision.  At step two, the ALJ determined that J.M.S. had a severe impairment of depression.  At step three of the analysis, the ALJ determined J.M.S. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings.  The ALJ found a less than marked limitation in only one functional domain:  interacting and relating to others.  The ALJ found that this was not enough to satisfy the criteria at step three, and the ALJ accordingly denied the claim.

## V.  DISCUSSION

Spencer advances several objections to the ALJ's decision, each of which is addressed, in turn, below.

### A.  Claimant's Case Treated Unfairly by the ALJ

Spencer contends that the ALJ acted unfairly when rendering his decision denying the

7

claim. Spencer claims that the ALJ "completely reversed himself" when deciding that J.M.S. did not meet or medically equal Listing 112.04, speculated about J.M.S.'s hallucinations and attempted suicide, and minimized J.M.S.'s psychological impairments.

Spencer argues that the ALJ "completely reversed himself" when rendering his decision that J.M.S. did not meet or medically equal Listing 112.04. Spencer's Brief at 11. Spencer contends that the ALJ limited the hearing because he thought that J.M.S. met the Listing 112.04, and so a functional evaluation was not necessary. However, the ALJ told the attorney to "make sure you [Spencer's attorney] cover everything . . . I'd like to have a backup release if I disagreed with your analysis on listings." R. at 54. The ALJ made it clear by this statement that he had not made a final determination and wanted the attorney to go over all issues relevant to the case, and his decision was therefore not a "complete reversal" on this point.

Spencer contends that the ALJ speculated that J.M.S.'s hallucinations were mere "imaginary persons in her life." R. at 36. The ALJ concluded, "None of the clinical evidence suggests that this behavior is pathological or even disruptive of the claimant's life." *Id.* In the case of J.M.S.'s hallucinations, the ALJ did not speculate as Spencer argues. The ALJ referenced J.M.S.'s testimony regarding her visions and that these hallucinations were controlled by medication. During the hearing, J.M.S. testified that she had experienced visions of a woman in fifth grade but that she no longer had visions. As the ALJ stated, the record does not suggest that J.M.S.'s hallucinations disrupted her life. Accordingly, the ALJ's determination regarding J.M.S.'s hallucinations was explained and supported by evidence in the record.

Spencer also argues that the ALJ speculated when coming to the conclusion that the child's attempted suicide was likely an act that was used to get attention. Spencer states that the

ALJ's decision was contrary to the evidence in this way. The ALJ referenced testimony given at the hearing in which Spencer agreed with his attorney's statements that J.M.S.'s suicide attempt occurred following an argument with her sister and that her mental health provider did not feel that she was in any danger of actually harming herself. R. at 51-52. However, the ALJ did not mention the evidence in the record that showed J.M.S. had thought about committing suicide on several occasions. For example, in January 2009 (one month prior to J.M.S.'s suicide attempt), Gallahue Mental Health Services reported that J.M.S. felt depressed and had thought about hanging herself. R. at 278. A psychiatric evaluation in September 2009 indicated that J.M.S. still had thoughts of suicide. R. at 329. Because the ALJ only cited evidence that supported his rationale that J.M.S.'s suicide attempt was likely an act to get attention, it is unclear whether he weighed all of the evidence.

Finally, Spencer contends that the ALJ's statement regarding J.M.S.'s "emotional outbursts" minimized her psychological impairments. R. at 36. The ALJ only cited Exhibit 4F, which consisted of a medical exam - not a psychological evaluation. There are numerous psychological reports available in the record, but the ALJ failed to include any of these in his rationale. R. at 161, 190, 220, 241. For this reason, the ALJ's decision is not supported by substantial evidence.

In sum, it is unclear from the ALJ's reasoning that he fairly weighed all of the evidence regarding J.M.S.'s suicide attempt and psychological impairments, and the case must be reversed and remanded for a full and fair analysis of the record as to these issues.

### B.  Lack of Substantial Evidence to Support Listing Determination at Step Three

Spencer argues that substantial evidence fails to support the ALJ's finding that J.M.S.

was not disabled because her impairment did not meet or medically equal Listing 112.04.  There is evidence in the record, including testimony and numerous medical and school evaluations, that may support the ALJ's decision.  R. at 127, 220, 299, 301.  However, the ALJ failed to articulate his reasoning, so it is unknown whether the ALJ considered this evidence.

Although the Commissioner specifically outlines the evidence in the record which supports the ALJ's decision, this post hoc analysis cannot substitute for the lack of reasoning provided by the ALJ.  *SEC v. Chenery Corp.,* 318 U.S. 80, 87-88 (1943).  "[I]t is improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision."  *McClesky v. Astrue,* 606 F.3d 351, 354 (7th Cir. 2010).  In this case, the ALJ did not adequately explain his rationale.  For example, in the ALJ's discussion of the six functional domains, he simply stated, "I incorporate the rationale and discussion above in regard to this domain."  R. at 37.  The ALJ must provide more explanation in order for this Court to meaningfully review his decision, as it is unclear whether he considered all the evidence in the case.

Additionally, there is evidence in the record that supports Spencer's claim that J.M.S. meets the listing criteria, but this evidence is not even mentioned by the ALJ's rationale.  The ALJ cannot simply select the parts of the record that support his decision without also examining the portions that favor Spencer.  *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001).

First, Spencer contends that J.M.S. has major depressive syndrome characterized by depressed or irritable mood, sleep disturbance, psychomotor agitation, suicidal thoughts or acts, and hallucinations.  Spencer supports this claim by stating that J.M.S. was diagnosed by Gallahue in November 2006 with adjustment disorder with mixed disturbance of emotion and

conduct. R. at 205. Spencer also states that J.M.S. was diagnosed by an agency physician in 2007 with major depression, post-traumatic stress disorder, and disruptive behavior disorder. R. at 222. A Gallahue report in August 2009 noted that J.M.S. showed signs of depression. R. at 288. Spencer adds that J.M.S. was prescribed Seroquel in September 2009. R. at 332.

Spencer claims that J.M.S.'s depressed mood is shown by the evidence described above and that her anger issues were recorded in a Gallahue report in February 2009. R. at 299. J.M.S.'s sleep disturbances are noted numerous times in the record. R. at 201, 245, 278. Her psychomotor agitation was described as hyperactive in Gallahue reports in October 2006 and January 2009. R. at 201, 278. J.M.S.'s suicidal thoughts and acts are described above. R. at 278, 329. Finally, J.M.S.'s hallucinations of a woman are reported in a Gallahue evaluation in December 2007 and again in February 2009. R. at 245, 328.

Next, Spencer argues that J.M.S. has a marked impairment in age-appropriate social functioning and personal functioning. In order to demonstrate social functioning impairment, Spencer notes that Gallahue reported in July 2007 that J.M.S. fought with siblings. R. at 207. Also, Gallahue reported in January 2009 that J.M.S. started a fire and was aggressive toward siblings. R. at 278. Spencer argues that J.M.S.'s suicide attempt, along with her GAF score of 50 in December 2006, are evidence that she has a marked personal functioning impairment.[1] R. at 162.

The ALJ failed to reference any of the above evidence when stating his rationale for denying Spencer's claim. Besides the testimony given, the ALJ only specifically referenced

---

[1] Spencer fails to note that J.M.S.'s 2009 GAF scores range from 59 on September 9, 2009, to 65 on March 13, 2009. Report at 301, 334.

11

Exhibit 4F, a single 2007 report from V. Serve Inc. that did not include any psychological evaluation. R. at 36.

Spencer also contends that the ALJ ignored or misstated the evidence when evaluating the six domains in determining that J.M.S. did not have an impairment or combination of impairments that functionally equals the listing. The ALJ found a less than marked limitation in only one domain: J.M.S.'s ability to interact and relate to others. The ALJ noted that J.M.S. had friends and related well to the adults during the hearing. However, the ALJ did not provide any explanation at all about his determination that J.M.S. did not meet the other domains. Instead of explaining his rationale for a domain, the ALJ referred back to his previous discussion by stating that he "incorporated his rationale" for that domain. R. at 37. It is impossible for the Court to identify and review the evidence that the ALJ considered for each domain based on this statement.

As discussed above, although there may be evidence to support the ALJ's denial of Spencer's claim, it is unclear from his rationale whether all of the evidence was properly considered in making that determination. It is unclear whether the ALJ even considered, let alone properly rejected, contrary evidence. It is also impossible to determine the ALJ's reasoning with respect to each of the six functional domains. For these reasons, the case must be remanded to the ALJ for complete analysis of the evidence of record.

### C. Failure to Use Psychological Medical Expert

Spencer argues that the ALJ erred in not using a medical expert to aid him in evaluating J.M.S.'s possible impairments. However, an ALJ's decision to call a medical expert is discretionary. 20 C.F.R. § 416.927(f)(2)(iii). In this case, it may not have been necessary for the

ALJ to call a medical expert to testify because there were records from four state agency physicians who had already administered functional evaluations.[2]  R. at 231-233, 268-271;  20 C.F.R. § 416.913(a)(1).  However, it is unclear from the ALJ's decision whether he actually considered these records.  For this reason, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion with respect to evaluating J.M.S.'s impairments, and the decision of the Commissioner must be reversed and remanded on this point.

### D.  Credibility Determination

Finally, Spencer argues that the ALJ's credibility determination is erroneous because the ALJ failed to make findings concerning the seven factors required to be considered when rejecting evidence of J.M.S.'s subjective symptoms pursuant to SSR 96-7p.  Specifically, Spencer claims that the ALJ did not fully consider factor two, which requires consideration of the duration, frequency, and intensity of the effects of J.M.S.'s symptoms.

The ALJ's assessment of J.M.S.'s credibility is entitled to special deference and is not grounds for reversal and remand unless it is "patently wrong." *E.g.*, *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).  In assessing the credibility of J.M.S., the ALJ need not cite findings on every factor, but he must articulate the reasons for his decision in such a way as to "make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (citing SSR 96-7p).

In this case, the ALJ did consider the duration, frequency, and persistence of J.M.S.'s

---

[2]  The Court notes that these reports date from 2007 and there are more recent reports from Gallahue.

symptoms. For example, the ALJ considered J.M.S.'s suicide attempt but noted that it was a single attempt. R. at 35. The ALJ also referenced Exhibit 4F, where it was noted that J.M.S. had never been hospitalized. R. at 56. Spencer's attorney himself stated that professionals at Gallahue did not feel that J.M.S. was in danger of harming herself. R. at 54. In regard to J.M.S.'s testimony about her visions, the ALJ stated that none of the evidence showed that these visions were disruptive to her life. In addition, J.M.S. testified that her visions were eliminated after taking medication. R. at 56. The ALJ stated that J.M.S.'s symptoms appeared to be adequately controlled by her medication. He also stated that he was aware of her "emotional outbursts, her issues surrounding her absent mother, and the counseling she received." R. at 36. The ALJ noted that J.M.S. used good vocabulary and related well to the adults during the hearing. R. at 36. The ALJ's reasoning behind his credibility determination was not perfunctory as Spencer claims; as discussed above, the ALJ explained his reasoning for this determination. The ALJ not only considered J.M.S.'s testimony, but also noted her history and medical records.

Because the ALJ's credibility determination was supported by evidence in the record, and the ALJ explained his reasoning, his credibility determination was not erroneous.

## VI. CONCLUSION

As set forth above, the ALJ in this case did not satisfy his obligation to articulate the reasons for his decision. Accordingly, the decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED:  06/29/2012

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

14

Copies to all counsel of record via electronic notification